## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENDRA MANGES (KELLER), | : | CIVIL NO.: 1:24-cv-00036 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LELAND DUDEK, [1] | : | |
| Acting Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. Introduction.

In this social security action, Plaintiff Kendra Manges (Keller) ("Manges")[2]

seeks judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying her claims for disability insurance benefits and

supplemental security income under Titles II and XVI of the Social Security Act.

---

[1] Leland Dudek is now the Acting Commissioner of Social Security, and he is automatically substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

[2] Because counsel refers to his client as Ms. Manges, we will refer to the plaintiff as Manges as well.

We have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons set forth below, we will vacate the Commissioner's decision and remand the case to the Commissioner for further proceedings.

## II. Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 9 -1* to 9-*8*.[3]  In December 2020, Manges protectively filed[4] an application for disability insurance benefits and an application for supplemental security income, alleging that she has been disabled since August 1, 2018. *See Admin. Tr.* at 239–50.  After the Commissioner denied her claims at the initial and reconsideration levels of administrative review, *id*. at 65–100, 101–24, Manges requested an administrative hearing, *id.* at 156–57.  On November 3, 2022, Manges—who was represented by counsel—as well as a vocational expert testified at a hearing before Administrative Law Judge Randy Riley (the "ALJ"). *Id*. at 36–64.  On November 18, 2022, the ALJ denied Manges's claims for benefits. *Id*. at 14–35.  Manges appealed the

---

[3] Because the facts of this case are well known to the parties, we do not repeat them here in detail.  Instead, we recite only those facts that bear on Manges's claims.

[4] "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits." *Stitzel v. Berryhill*, No. 3:16-CV-0391, 2017 WL 5559918, at *1 n.3 (M.D. Pa. Nov. 9, 2017).  "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." *Id*.

ALJ's decision to the Appeals Council, which denied her request for review. *Id.* at 1–6. This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

In January 2024, Manges, represented by counsel, began this action by filing a complaint seeking review of the Commissioner's decision denying her claims. *See Doc. 1.* She requests that the court reverse the Commissioner's decision and award her benefits or, in the alternative, remand the case for further proceedings. *Id.* at 3 (Wherefore Clause). She also seeks "such relief" as the court deems justified, including attorney's fees. *Id.*

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 7.* The Commissioner then filed an answer and a certified transcript of the administrative proceedings. *Docs. 8, 9.* The parties filed briefs, *see docs. 12, 16, 21*, and this matter is ripe for decision.

## III. Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

3

But the court's review of the Commissioner's factual findings is limited to whether substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 587 U.S. 97, 99 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 587 U.S. at 103. Substantial evidence "means— and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Manges is disabled, but whether substantial evidence supports the Commissioner's finding that she is not disabled and whether the Commissioner correctly applied the relevant law.

### B. Initial Burdens of Proof, Persuasion, and Articulation.

To receive benefits under Title II or Title XVI of the Social Security Act, a claimant generally must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. §1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a).

Further, to receive disability insurance benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).[5]  Unlike

---

[5] "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid

with disability insurance benefits under Title II of the Social Security Act, "[i]nsured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits" under Title XVI of the Social Security Act. *Snyder v. Colvin*, No. 3:16-CV-01689, 2017 WL 1078330, at *1 (M.D. Pa. Mar. 22, 2017). Supplemental Security Income "is a federal income supplement program funded by general tax revenues (not social security taxes)" "designed to help aged, blind or other disabled individuals who have little or no income." *Id*.

The ALJ follows a five-step sequential-evaluation process to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).

---

social security taxes." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *1 n.5 (M.D. Pa. Mar. 14, 2014) (citing 42 U.S.C. §§ 415(a), 416(i)(1)). "The last date that an individual meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Id*. (citing 42 U.S.C. § 416(i)(2)). Here, the ALJ determined that Manges met the insured-status requirements through September 30, 2023. *Admin. Tr.* at 17, 19.

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019). The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

"The claimant bears the burden of proof at steps one through four" of the sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). But at step five, "the burden of production shifts to the Commissioner, who must . . . show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The ALJ's disability determination must also meet certain basic substantive requisites. Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). "The ALJ must indicate in his decision which

evidence he has rejected and which he is relying on as the basis for his finding."
*Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999).  The
"ALJ may not reject pertinent or probative evidence without explanation." *Johnson
v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).  Otherwise, "'the
reviewing court cannot tell if significant probative evidence was not credited or
simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

## IV.  The ALJ's Decision.

On November 18, 2022, the ALJ denied Manges's claims for benefits.
*Admin. Tr.* at 14–35.  He proceeded through the five-step sequential-evaluation
process.

### A.  Step One.

At step one of the sequential-evaluation process, the ALJ found that Manges
had not engaged in substantial gainful activity since her alleged onset date of
August 1, 2018, through that date of the ALJ's decision. *Id.* at 19, 30.

### B.  Step Two.

At step two of the sequential-evaluation process, the ALJ found that Manges
had the following severe impairments: postural orthostatic tachycardia syndrome
("POTS"), degenerative disc disease of the cervical spine, low back pain, migraine

headaches, and inflammatory bowel disease. *Id*. at 19.  The ALJ also found that

Manges had several other non-severe physical impairments and that her mental

impairments of depression and anxiety were also non-severe. *Id*. at 20–22.

### C.  Step Three.

At step three of the sequential-evaluation process, the ALJ found that

Manges did not have an impairment or combination of impairments that met or

medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix

1. *Id*. at 22–23.  Specifically, the ALJ considered Listings 1.15  (Disorders of the

skeletal spine resulting in compromise of a nerve root(s)), 1.16 (Lumbar spinal

stenosis resulting in compromise of the cauda equina), and 5.06 (Inflammatory

bowel disease). *Id*.

The ALJ also stated that Manges's "history of POTS and migraine

headaches do not meet any section of the listings, as there is no evidence indicating

that these conditions have increased the severity of any of [her] coexisting or

related impairments to the extent that the combination of such impairments meets

the requirements of a listing." *Id*. at 23.

**D.  The RFC.**

The ALJ then determined that Manges had the RFC to do light work[6] with some limitations. *Id*. at 23.  He concluded that Manges can only occasionally crawl, and she can never climb ladders, ropes, or scaffolds. *Id*.  He also concluded that she must "avoid exposure to extreme cold, bright or flashing lights, excessive noise, vibration, and hazards, such as heights and machinery." *Id*.

In making this RFC assessment, the ALJ considered Manges's contentions. He noted that Manges "alleges disability due to POTS, neck and low back pain, migraine headaches, and irritable bowel syndrome." *Id*. at 24.  And, he acknowledged, "[s]he testified to limited walking, only a few minutes at a time," "that she is unable to stand still[,]" "that she becomes tired easily and naps during the day[,]" and that she has "2-3 migraine headaches per month with sensitivity to sound, lasting 2-3 days at times, and with decreased focus and concentration." *Id*.[7]

_____

[6] *See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.").

[7] For readability purposes, here—and elsewhere—when citing or quoting the ALJ's decision, we omit the ALJ's citations to the record.

He further noted that she "alleges that any change in position causes symptoms[,]" and that she has "difficulty lifting, squatting, bending, reaching, sitting, climbing stairs, completing tasks, following instructions, and getting along with others." *Id*.

The ALJ concluded that although Manges's impairments "could reasonably be expected to cause the alleged symptoms[,]" her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id*.

In making the RFC assessment, the ALJ summarized Manges's medical records and treatment notes. *Id*. at 24–26. And he summarized the medical opinion evidence and prior administrative medical findings in the record. *Id*. at 26–28.

The ALJ explained his RFC finding as follows:

> The undersigned finds that [Manges]'s allegations regarding the limiting effects of her alleged conditions are not supported by the record. While [Manges] has a clinical history significant for the above severe impairment[s], the medical evidence of record indicates that she is able to perform work within the light exertional level with additional non-exertional limitations. [Manges] alleges significant limitations. However, her treatment has been overall routine and conservative in nature with her treatment limited to management with her primary care provider. The record indicates that [Manges] stopped Topamax and has not started on another preventive [for] migraine headaches since and with no evaluation with neurology sought or recommended since the alleged onset date. On March 4, 2021, Dr. McDermott noted that [Manges] was no longer taking medications and was trying to avoid as many medications as she can. He recommended that she continue with medical

11

marijuana and Tylenol for headache and her chronic pain complaints.  On June 29, 2021, [Manges] reported a recent fall without injury related to her POTS.  Nurse Day prescribed the rolling walker, as requested.  However, the record indicates that [Manges] was consistently found to present with a normal gait and intact strength throughout her extremities.  The record indicates no further falls secondary to POTS with her recent fall in October 2022 secondary to her dog pulling her down the stairs, as discussed above.  [Manges] alleges involuntary weight loss with a history of IBS with diarrhea.  On May 30, 2019, [Manges]'s weight was noted at 110 pounds down from 113 pounds over the last month.  At that time, [Manges] had delivered her last child 11 weeks previously.  Since the alleged onset date, the record indicates that [Manges]'s weight has remained overall stable.  At her January 20, 2022, consultative physical examination her weight was noted at 103 pounds.  On October 10, 2022, her weight was noted at 99 pounds with a BMI of 16.11.  Based on the foregoing, the undersigned finds [Manges] has the above residual functional capacity assessment, which is supported by the medical evidence of record.

*Id*. at 28.

### E.  Step Four.

At step four of the sequential-evaluation process, the ALJ found that Manges could not perform her past relevant work as a certified nursing assistant. *Id*. at 28.

### F.  Step Five.

At step five of the sequential-evaluation process, considering Manges's age, education, work experience, and RFC, as well as the testimony of a vocational expert, the ALJ found that there were jobs—such as cashier, mail sorter, and

surveillance system monitor—that exist in significant numbers in the national economy that Manges could perform. *Id*. at 29–30.

In sum, the ALJ concluded that Manges was not disabled from August 1, 2018 (which is the alleged onset date), through that date of the ALJ's decision on November 18, 2022. *Id*. at 30. Thus, he denied Manges's claims for benefits. *Id*.

## V. Discussion.

Manges presents several claims. We begin by addressing her claims that the ALJ erred in how he addressed her migraine headaches. Manges includes her arguments in this regard under the section of her brief titled "Substantial Evidence Does Not Support the ALJ's Step Three Analysis." *Doc. 12* at 14–19 (all caps omitted). She argues that at step three, the ALJ failed to consider Listing 11.02 with regard to her headaches. *Id*. She also argues that the ALJ failed to address whether she was limited to quiet/library level noise and whether she would have been off task because of her headaches, and she contends that such error was not harmless because if the ALJ had concluded that she had such limitations, she would be unable to do two of the three jobs identified by the ALJ at step five. *Id*. at 18–19. This latter argument implicates the ALJ's RFC assessment, rather than his step three analysis. Nevertheless, the Commissioner recognizes that in addition to claiming that the ALJ erred at step three, Manges is claiming that the ALJ erred by

failing to include additional limitations regarding her headaches in the RFC assessment. *See doc. 16* at 18 ("Plaintiff maintains that the ALJ inappropriately concluded her headaches did not meet or medically equal the criteria of the Listings and failed to account for them in the RFC assessment."). And the Commissioner addresses the ALJ's RFC assessment with regard to Manges's headaches, concluding that "[b]ecause the ALJ's 13-pages single-spaced decision reflects his thorough consideration of the evidence, he explained how he accounted for Plaintiff's headaches, and no further limitations from headaches were warranted, the Court should reject her argument on this point." *Id*. at 22–23. Thus, we conclude that in addition to presenting a claim that the ALJ erred at step three, Manges is presenting a claim that the ALJ should have included additional limitations in the RFC to account for her headaches. With that understanding in mind, before we address Manges's specific contentions, we set forth the standards applicable to the step three analysis of headaches and to the RFC determination.

### A. Step 3 and Headaches.

Appendix 1 of 20 C.F.R. Part 404, Subpart P ("Listing of Impairments") describes, for each major body system, impairments that the Commissioner considers to be severe enough to prevent a claimant from doing any gainful activity regardless of the claimant's age, education, or work experience. 20 C.F.R.

§ 404.1525(a).  "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  "[T]he medical criteria defining the listed impairments" is set "at a higher level of severity than the statutory standard." *Id*. at 532.  "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Id*.  "The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Id*.  If a claimant's impairment meets or is equivalent to a listed impairment, then the claimant "is *per se* disabled and no further analysis is necessary." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).  But "[i]f a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

"In step three, the ALJ must determine whether [the claimant's] impairment matches, or is equivalent to, one of the listed impairments." *Burnett*, 220 F.3d at 119.  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Zebley*, 493 U.S. at 530 (italics in original); *see also* 20 C.F.R. § 404.1525(c)(3) ("We will find that your impairment(s) meets

15

the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement."); 20 C.F.R. § 404.1525(d) ("To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing.").  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530 (footnote omitted).  "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for [a] listed impairment." *Id*. at 531 (italics in original) (footnote omitted); *see also* 20 C.F.R. § 404.1526(a) ("Your impairment(s) is medically equivalent to a listed impairment in appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment.").

There is no listing for migraine headaches. *See Soc. Sec. Ruling 19-4p, Titles II & XVI: Evaluating Cases Involving Primary Headache Disorders*, 2019 WL 4169635 (S.S.A. Aug. 26, 2019) ("SSR 19-4p") ("Primary headache disorder is not a listed impairment in the Listing of Impairments (listings).").  But "SSR 19-4p explains how primary headache disorders, like migraines, are evaluated at step three." *Tyson v. Kijakazi*, 1:21-CV-855, 2022 WL 3975002, at *10 (M.D. Pa. July 25, 2022), *report and recommendation adopted*, 2022 WL 3971041 (M.D. Pa.

16

Aug. 31, 2022)). SSR 19-4p provides that "a primary headache disorder, alone or in combination with another impairment(s)" may "medically equal[] a listing." *SSR 19-4p*, 2019 WL 4169635 at \*7. And it identifies Listing 11.02, which addresses epilepsy, as "the most closely analogous listed impairment" for a primary headache disorder. *Id.* More specifically, SSR 19-p4 provides that "[w]hile uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) [medically determinable impairment(s)] medically equals the listing." *Id.* "Thus, an ALJ should look to Listings 11.02B and 11.02D in assessing whether a claimant's migraine headache impairment medically equals a listing." *Tyson*, 2022 WL 3975002 at \*10.

"Listing 11.02B describes dyscognitive seizures 'occurring at least once a week for at least 3 consecutive months . . . despite adherence to prescribed treatment.'" *Falardo-Weller v. Kijakazi*, NO. 3:22- CV-01026, 2023 WL 6119101, \*6 (M.D. Pa. Sept. 18, 2023) (quoting 20 C.F.R. Part 404, Subpart P, App.1, § 11.02B). "To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B," the ALJ should consider the following factors:

> [(1)] A detailed description from an AMS [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); [(2)] the

17

frequency of headache events; [(3)] adherence to prescribed treatment; [(4)] side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and [(5)] limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4P, 2019 WL 4169635 at *7.

Listing 11.02D, on the other hand, "requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one" of the following areas: "[p]hysical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself." *Id.* In evaluating 11.02D, the ALJ should consider the same factors—set forth above—for considering 11.02B. *Id.*

## B.  The RFC.

"The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).  The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett*, 220 F.3d at 121 (quoting *Hartranft*, 181 F.3d at 359

18

n.1).  In assessing a claimant's RFC, the ALJ must consider all the evidence of record. *Burnett*, 220 F.3d at 121.  "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Plummer*, 186 F.3d at 429 (quoting *Mason*, 994 F.2d at 1066). The court's "review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence." *Wilder v. Kijakazi*, 1:20-CV-492, 2021 WL 4145056, at *6 (M.D. Pa. Sept. 9, 2021); *see also Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002) ("We examine the ALJ's conclusions as to [the claimant's] residual functional capacity with the deference required of the substantial evidence standard of review.").

Further, "[s]urveying the medical evidence to craft an RFC is part of the ALJ's duties." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006).  And "[i]n evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor over that of another." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505 (3d Cir. 2009).  In fact, in evaluating the medical opinion evidence of record, "the ALJ is not only entitled but required to choose between" conflicting medical opinions. *Cotter,* 642 F.2d at 705.

In setting the RFC, the ALJ must also clearly articulate his or her reasoning. In other words, the ALJ must "set forth the reasons for his decision" to allow for meaningful judicial review. *Burnett*, 220 F.3d at 119 (citing *Cotter*, 642 F.2d at

704–05).  Although an ALJ need not "use particular language or adhere to a particular format in conducting his analysis," the ALJ must ensure "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).  The ALJ's decision must set out "a clear and satisfactory explication of the basis on which it rests." *Cotter*, 642 F.2d at 704.  If an ALJ "has not sufficiently explained" how he or she considered all the evidence "'to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Dantzler v. Saul*, No. 3:16-CV-2107, 2019 WL 5569466, at *1 (M.D. Pa. Oct. 28, 2019) (quoting *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979)).

### C.  The ALJ erred in connection with the analysis of Manges's migraine headaches.

Manges claims that the ALJ failed to consider Listing 11.02 in accordance with SSR 19-4p.  She also contends that the ALJ's erred by not including additional limitations in the RFC regarding her migraine headaches.  We conclude that the ALJ erred in both regards.

20

The ALJ's step three analysis regarding Manges's migraine headaches is

cursory; it reads in full:

> [Manges]'s history of POTS and migraine headaches do not
> meet any section of the listings, as there is no evidence
> indicating that these conditions have increased the severity of
> any of [Manges]'s coexisting or related impairments to the
> extent that the combination of such impairments meets the
> requirements of a listing.

*Admin. Tr.* at 23.  As Manges points out, the ALJ did not refer or cite to either

Listing 11.02 or SSR 19-4p.  And, according to Manges, the record demonstrates

the severity and impact of her headache impairment:

> In January 2020, Ms. Manges sought emergency care for
> headache, slurred speech, back pain, and nausea.  She was
> diagnosed with severe migraine headache and left against
> medical advice.  In February 2020, Ms. Manges reported daily
> migraines, panic attacks, neck stiffness, lightheadedness, and
> palpitations.  She was diagnosed with orthostatic hypotension,
> cervical disc degeneration, and migraine.  In March 2020, Ms.
> Manges affirmed headaches associated with auras.  She
> indicated that laying down alleviated her headaches.  Dr.
> McDermott diagnosed cervical disc degeneration and migraine,
> prescribed Amitriptyline, and recommended craniosacral
> therapy and acupuncture.  In May 2020, Ms. Manges reported
> pain across the jaw, neck, and shoulder/arm region, nausea, and
> jaw tightness.  Dr. McDermott diagnosed migraine headaches
> and prescribed Topamax.  At the request of the Agency, Ms.
> Manges attended an internal medicine consultative examination
> in May 2021. Ms. Manges reported POTS symptoms, neck
> pain, back pain, depression, anxiety, and chronic migraine
> headaches associated with sound sensitivity and nausea.
> Consultative examiner K. Hammon, N.P. diagnosed POTS,
> degenerative discs with chronic neck and back pain, anxiety,
> depression, and chronic migraine headaches.  In a later
> consultative examination in January 2022, Ms. Manges

> affirmed headaches.  She indicated that her migraine headaches
> started in 2009 and her headaches were associated with nausea
> and sensitivity to light and sound.  She reported experiencing
> four episodes of migraine headaches per month.  Consultative
> examiner Dr. Kneifati diagnosed migraine headaches and
> opined that Ms. Manges was limited to quiet (library) noise
> level.  At the hearing, Ms. Manges testified that she suffered
> from migraines two to three times a month and each migraine
> lasted two to three days.  She described her migraine headache
> as a pressure behind her eyes, followed by an aura and vision
> issues in her eyes.  She also described being sensitive to sound
> and light and vomiting.  Following a migraine, she needed to lie
> down and sleep.

*Doc. 12* at 16–17.  Manges contends that the ALJ did not discuss the relevant

factors under SSR 19-4p.

The Commissioner responds that SSR 19-4p does not mandate that the ALJ

specifically mentions Listing 11.02 or SSR 19-4p it in his step three analysis.  And

the Commissioner contends that ALJ considered and discussed Manges's

headaches in a way that permits meaningful judicial review.  In this regard, the

Commissioner notes that the ALJ cited to treatment records that noted that Manges

reported migraines; cited to Manges's hearing testimony regarding her migraines;

noted that Manges stopped Topamax, had not started on another migraine

medication (but had continued with medical marijuana and Tylenol for headaches),

and did not seek a neurological evaluation; and noted that Manges's brain MRI was within normal limits.[8]

We conclude that the ALJ erred by failing to articulate whether Manges's migraine headaches are equivalent to Listing 11.02 in accordance with SSR 19-4p.

The Third Circuit "requires the ALJ to set forth the reasons for his decision" at step three. *Burnett*, 220 F.3d at 119. The purpose of this requirement "is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones*, 364 F.3d at 505 (citing *Burnett*, 220 F.3d at 120). "Conclusory statements that a condition does not constitute the medical equivalent of a listed impairment are insufficient." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009). This is because a bare conclusion that an impairment does not meet or equal a listing "'is beyond meaningful judicial

---

[8] The Commissioner also asserts that no medical source opined that Manges's headaches met or equaled a listing. But the ALJ did not cite that as a reason for his decision. And "[t]he court may not . . . evaluate the ALJ's administrative decision on any grounds other than those the ALJ actually relied upon in making his decision." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *6 n.13 (M.D. Pa. Mar. 14, 2014) (citing *SEC v. Chenery,* 332 U.S. 194, 196 (1947) (stating that a court must judge the propriety of an administrative decision that the "administrative agency alone is authorized to make" solely on the grounds the agency invoked, and if those grounds are inadequate or improper, the court cannot affirm the agency's decision)). Because the ALJ did not mention that no medical source opined that Manges's headaches met or equaled a listing, we do not consider that in determining whether the ALJ erred. Of course, whether a medical source opined that Manges's headaches met or equaled a listing may be relevant to determining if any error by the ALJ was harmless.

review.'" *Burnett*, 220 F.3d at 119 (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)).  But the ALJ is not required "to use particular language or adhere to a particular format in conducting his analysis." *Jones*, 364 F.3d at 505. And the ALJ's decision must be "read as a whole[.]" *Id*.

Here, reading that ALJ's decision as a whole—including his discussion of Manges's headaches in connection the RFC assessment—we conclude that the ALJ's step three analysis is beyond meaningful judicial review.  At the outset, we note that the ALJ concludes only that Manges's migraines do not meet a listing. He did not determine whether Manges's headache impairment was equivalent to a listing even if does not meet any listing.  It is not clear even that the ALJ recognized that it could be equivalent to a listing.  Nor does the ALJ acknowledge that Manges's headache impairment alone could be equivalent to a listing.  The ALJ asserts only that Manges's migraine headaches (and POTS) do not meet a listing because there is no evidence that they increased the severity of any of Manges's other impairments.  But, as set forth above, SSR 19-4p provides that "a primary headache disorder, **alone** or in combination with another impairment(s)" may "medically equal[] a listing." *SSR 19-4p*, 2019 WL 4169635 at *7 (emphasis added).

Further, although the Commissioner is correct that the ALJ discusses Manges's headaches later in his decision, we disagree with the Commissioner's

position that the ALJ's later discussion was sufficient to satisfy his duty of articulation as to step three.  As the Commissioner asserts, the ALJ cited to treatment records that noted that Manges reported migraines; cited to Manges's hearing testimony regarding her migraines; noted that Manges stopped Topamax, had not started on another migraine medication (but had continued with medical marijuana and Tylenol for headaches), and did not seek a neurological evaluation; and noted that Manges's brain MRI was within normal limits.  But the ALJ's discussion does not address the requirements of Listing 11.02B or 11.02D or the factors set forth in SSR 19-4p.[9]  In sum, the ALJ's conclusory step three analysis, even when coupled with his later discussion of Manges's headaches, "prevents the Court from conducting a meaningful, albeit deferential, review." *Falardo-Weller*, 2023 WL 6119101 at *8.

The ALJ also erred in addressing Manges's migraine headaches in connection with his RFC assessment.  Manges argues that the ALJ failed to

---

[9] "The explanatory comments for the neurological listings," of which 11.02 is a part, "discuss how the Commissioner will 'consider adherence to prescribed treatment[.]'" *Tyson*, 2022 WL 3975002 at *13.  Those comments provide: "Despite adherence to prescribed treatment means that you have taken medication(s) or followed other treatment procedures for your neurological disorder(s) as prescribed by a physician for three consecutive months but your impairment continues to meet the other listing requirements despite this treatment." 20 C.F.R. Part 404, Subpart P, Appx. 1, § 11.00C.  Although the ALJ notes that Manges stopped taking stopped Topamax, he does not address whether she took that medication for three consecutive months before stopping it.

address whether she was limited to quiet/library level noise.  We agree with

Manges that the ALJ failed to adequately explain his decision that she must avoid

exposure to excessive noise instead of limiting her to quiet/library level noise.

Moreover, the ALJ failed to even mention that one of the consultative examiners,

Dr. Kneifati, opined that she was limited to quiet/library level noise.

> In his decision, the ALJ summarized Dr. Kneifati's opinions as follows:

> On January 20, 2022, Dr. Kneifati assessed [Manges]'s
> functional abilities: she can lift and carry twenty pounds
> occasionally.  She can sit for one hour at a time for a total of
> five hours in an eight-hour workday.  She can stand for 30
> minutes at one time for a total of four hours in an eight-hour
> workday.  She can walk for 30 minutes at one time for a total of
> two hours in an eight-hour workday.  She can feel occasionally
> with the right hand and frequently with the left hand.  She can
> reach, including overhead, handle, finger, push, and pull
> frequently. She can operate bilateral foot controls frequently.
> She can never climb ladders or scaffolds or balance.  She can
> occasionally climb stairs and ramps, stoop, kneel, crouch, and
> crawl.  She is unable to tolerate exposure to unprotected
> heights, moving mechanical parts, and operating a motor
> vehicle.  She can tolerate occasional exposure to humidity,
> wetness, extreme cold, and extreme heat and continuous
> exposure to dust, odors, fumes, pulmonary irritants, and
> vibrations.  She has no ambulatory limitations.

*Admin. Tr.* at 27.

> But Dr. Kneifati also opined that Manges was limited to quiet/library level

noise. *Id*. at 866.  Although the ALJ detailed in his decision all of Dr. Kneifati

opinions regarding Manges' other limitations, he did not mention Dr. Kneifati's

opinion that Manges was limited to quiet/library level noise.  This was error.

"When a conflict in the evidence exists, the ALJ may choose whom to credit but "'cannot reject evidence for no reason or for the wrong reason.'" *Plummer*, 186 F.3d at 429 (quoting *Mason,* 994 F.2d at 1066).  "The ALJ must consider all relevant evidence when determining an individual's residual functional capacity in step four." *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001).  Although the ALJ must consider all the evidence, "'[i]n some circumstances, a piece of evidence can be so lacking in probative value, or so overwhelmed by countervailing evidence, that it can be implicitly rejected without explanation.'" *Caraballo v. Colvin*, 1:14-CV-647, 2015 WL 6501223, at *7 (M.D. Pa. Oct. 27, 2015) (quoting *McConnell v. Astrue,* 3:09–44, 2010 WL 2925053, at *9 (W.D. Pa. July 20, 2010)).  Thus, "[t]here is no requirement that the ALJ discuss in [his] opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).

Here, concluding that Manges's migraine headaches constituted a severe impairment and that some noise limitation was warranted, the ALJ determined that Manges must avoid exposure to excessive noise, but he failed to explain how or why he arrived at that limitation rather than a limitation to quiet/library level noise as opined by Dr. Kneifati.  Further, Dr. Kneifati's opinion that Manges is limited to quiet/library level noise is no mere tidbit.  Rather, it is material to the RFC assessment because as Manges asserts—and the Commissioner fails to

controvert—two of the three jobs identified by the ALJ require the ability to tolerate moderate noise level.[10]  Thus, if the ALJ had accepted Dr. Kneifati's opinion in this regard, the ALJ's decision may have been different.  Accordingly, when making his RFC assessment, the ALJ erred in not analyzing Dr. Kneifati's opinion that Manges was limited to quiet/library level noise.

The question then is whether the ALJ's errors regarding Manges' migraines headaches were harmless.

"Ordinary harmless error review, in which the appellant bears the burden to demonstrate harm, is applicable to administrative appeals." *Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016).  Thus, a claimant must explain "'how the . . . error to which he points could have made any difference.'" *Id.* (quoting *Shinseki v. Sanders,* 556 U.S. 396, 413 (2009)).  "An error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover." *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).  Although an error may be harmless, we must be mindful that "'[t]he grounds upon which an administrative order must be judged

_____

[10] Manges also asserts that the third job identified by the ALJ—a surveillance systems monitor—is obsolete. *See doc. 12* at 18 n.2 (citing *Cunningham v. Astrue*, 360 F. App'x 606, 615 (6th Cir. 2010) (remanding "to the Commissioner for consideration of whether the DOT listings, specifically the document preparer and security camera monitor descriptions, were reliable in light of the economy as it existed at the time of the hearing before the ALJ").  The Commissioner has not responded to this assertion either.

are those upon which the record discloses that its action was based.'" *Fargnoli*,

247 F.3d at 44 n.7 (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80,

87 (1943)).

     As set forth above, had the ALJ accepted Dr. Kneifati's opinion that Manges

was limited to quiet/library level noise, the ALJ's decision may have been

different. Thus, we cannot say that the ALJ's error in this regard was harmless,

and we will vacate the ALJ's decision. Because this error was not harmless, we

need not address whether the ALJ's step three error was also harmless.


**D. Other Claims.**

     Given our conclusion that the Commissioner's decision must be vacated

based on the ALJ's error in failing to address Dr. Kneifati's opinion that Manges

was limited to quiet/library level noise when determining her RFC, we will not

address Manges's remaining claims of error. "Plaintiff's additional claims of error

may be remedied through the case's treatment on remand." *Brown v. Saul*, No. CV

3:18-1619, 2020 WL 6731732, at *7 (M.D. Pa. Oct. 23, 2020), *report and*

*recommendation adopted*, 2020 WL 6729164, at *1 (M.D. Pa. Nov. 16, 2020). "A

remand may produce different results on these claims, making discussion of them

moot." *Id*.

**E.  Remand is the appropriate remedy.**

Because the ALJ's decision is not support by substantial evidence, the question then is whether the court should remand the case to the Commissioner for further proceedings or award benefits to Manges.  We conclude that remand is the appropriate remedy.

Under sentence four of 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  Thus, although a remand is often the appropriate remedy, the court may also enter an order awarding the claimant benefits. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 358 (3d Cir. 2008) (remanding the case to the district court with directions to enter an order awarding the payment of benefits); *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000) (same); *Podedworny v. Harris*, 745 F.2d 210, 223 (3d Cir. 1984) (same).  But an "award [of] benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221–22.  Whether there has been excessive delay and/or prior remands also bears on whether to award benefits or to remand for further proceedings. *Diaz v. Berryhill*, 388 F. Supp. 3d 382, 391 (M.D. Pa. 2019).  "Thus, in practice any

decision to award benefits in lieu of ordering a remand for further agency consideration entails the weighing of two factors: First, whether there has been an excessive delay in the litigation of the claim which is not attributable to the claimant; and second, whether the administrative record of the case has been fully developed and substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Id*.

Here, there has not been excessive delay in the litigation of Manges's claims, and we cannot say that substantial evidence on the record as a whole shows that Manges is disabled and entitled to benefits. Thus, we will remand the case to the Commissioner for further proceedings.

## VI. Conclusion.

For the foregoing reasons, we will vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). An appropriate order follows.

_**S/Susan E. Schwab**_
Susan E. Schwab
United States Magistrate Judge